**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02588-MSK-KMT

**REBECCA R. HAMMOND, as personal representative of the estate of Robert P. Hammond,**

   **Plaintiff,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation,**

   **Defendant.**

_____

**OPINION AND ORDER AFFIRMING DECISION**
_____

**THIS MATTER** comes before the Court for a review of the decision of the

Administrator of a welfare benefit plan covered by the Employee Retirement and Income

Security Act ("ERISA"), 29 U.S.C. § 1132.  The Plaintiff, as representative of the estate of Mr.

Hammond, the named insured, alleges that the Administrator's decision to deny a claim for

benefits by Mr. Hammond was arbitrary and capricious in violation of ERISA.  The Court has

reviewed the Plaintiff's brief (# 44) in support of her challenge to the Administrator's decision,

the Defendant's brief (# 46) in support of the Administrator's decision, and the Plaintiff's reply

brief (# 58), along with the contents of the Administrative Record (# 17).

## FACTS

The Court briefly sketches the relevant facts here, elaborating as necessary in its analysis.

Mr. Hammond served as Vice President for Information Security for Citigroup. Mr. Hammond

was the insured under the terms of a long-term disability insurance policy issued by Defendant

1

Metropolitan Life Insurance Company ("Met Life").  The policy provided for the payment of benefits to Mr. Hammond if, "due to sickness . . . or accidental injury," he was rendered "disabled," such that he was unable to earn a specified portion of his pre-disability earnings in his occupation.

Mr. Hammond filed a claim for benefits pursuant to a short-term disability policy in 2006, claiming that complications from shoulder surgery impaired his ability to use his right arm, thus preventing him from performing occupational tasks such as typing and performing travel duties.  Met Life approved Mr. Hammond's claim and began paying him benefits.  In 2007, Mr. Hammond's claim was converted to one for long-term disability benefits under the policy at issue here, and Mr. Hammond continued to receive benefits.  The terms of the policy required Mr. Hammond to apply for Social Security Disability Insurance ("SSDI") at this time.  Mr. Hammond did so, and in 2009, a Social Security ALJ determined that Mr. Hammond was disabled for purposes of SSDI benefits, retroactive to 2007.   Met Life annually revisited Mr. Hammond's claim for benefits under the policy, continuing to find him eligible for further benefits.

In early 2010, Met Life received information from Mr. Hammond's physician that called into question whether he was unable to perform his job duties.  Met Life retained a private investigator to observe Mr. Hammond's public activities.  The investigator observed Mr. Hammond shoveling snow, lifting and carrying bags of cement and assisting with a home improvement project.  In July 2010, based on the surveillance video, as well as other correspondence with Mr. Hammond's doctors and Met Life's own review of records, Met Life informed Mr. Hammond that it had concluded that he was capable of resuming his job duties and

thus, was no longer eligible for benefits.  Mr. Hammond filed an appeal of that decision, but after

a review, Met Life affirmed the denial of further benefits in November 2010.

Due to Mr. Hammond's death on August 5, 2012, the case now sits in a somewhat

unusual posture.  The Plaintiff's brief makes clear that the claim for past benefits is limited to

the period between July 10, 2012 and August 5, 2012.[1]  However the Plaintiff also claims that, if

Mr. Hammond remained eligible for benefits at the time of his death, a survivor benefit,

amounting to approximately 6 times the monthly benefit, is also owed.  In addition, the Plaintiff

seeks attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

## ANALYSIS

### A.  Standard of review

28 U.S.C. § 1132(a)(1)(B) permits a beneficiary of an ERISA plan to bring suit "to

recover benefits due to him under the terms of the plan."  In *Metropolitan Life Ins. Co. v. Glenn*,

554 U.S. 105, 110-11 (2008), the Supreme Court summarized its prior rulings setting forth the

standard of review to be used in such cases: (i) the court must conduct a *de novo* review of the

determination unless the plan provides to the contrary; (ii) if the plan provides discretionary

authority to the Plan Administrator to make eligibility determinations, the court should instead

apply a deferential standard of review to such determinations and reverse only where the Plan

Administrator has abused his or her discretion; and (iii) if the Plan Administrator is operating

under a conflict of interest (*i.e.* where the administrator of the plan is the same entity that funds

the payment of claims, such that there is a financial incentive for the administrator to deny

---

[1]    The parties do not address whether benefits were paid to Mr. Hammond between Met
Life's denial of his November 2010 appeal and the July 12, 2012 date on which the Plaintiff's
claim for past-due benefits begins.

benefit claims), the nature and extent of that conflict must be "weighed as a factor" in determining whether the Plan Administrator has abused his or her discretion.  The Supreme Court in *Glenn* made clear that the weight to be given to the fact of a Plan Administrator's conflict of interest will necessarily be case-specific, informed by both the nature and severity of the conflict itself and the relative clarity of all other factors on the Plan Administrator's decision. *Id.* at 117-19 (suggesting that "any one factor will act as a tiebreaker when the other factors are closely balanced . . . depending upon the tiebreaking factor's inherent or case-specific importance").

Here, the Plaintiff concedes that the policy grants discretion to Met Life to make eligibility determinations and construe the terms of the policy.  Thus, the Court's review is limited to determining whether Met Life's decision to terminate Mr. Hammond's benefits was "arbitrary and capricious" (while necessarily taking into account any conflict of interest Met Life had).  *LaAsmar v. Phelps Dodge Corp.*, 605 F.3d 789, 796 (10th Cir. 2010) (articulating "arbitrary and capricious" standard).   It is not necessary that Met Life's decision be the only logical one dictated by the record, or even that it be the best one; so long as it is grounded in any reasonable basis established in the record, the Court must uphold it.  *Nance v. Sun Life Assur. Co.*, 294 F.3d 1263, 1269 (10th Cir. 2002).  However, if Met Life's determination is not supported by substantial evidence in the record, or if Met Life's construction of policy language is unreasonable, the Court will reverse that determination.  *Id.*; *LaAsmar*, 605 F.3d at 796.

### B.  Merits

#### 1.  Policy language

The policy provides for the payment of benefits to an insured who becomes "disabled"

(or suffers a "disability").  An insured is "disabled" when three criteria are met: (i) the person is suffering from a sickness, pregnancy, or accidental injury; (ii) the person is receiving "Appropriate Care and Treatment" from a doctor on a continuing basis; and (iii) the person's sickness or injury sufficiently impairs the person's ability to work.  The criteria for establishing this third element – sufficient impairment of the ability to work – vary depending on the duration of the impairment.  During the first 13 weeks (the "elimination period") from the onset of the sickness or injury, the person is sufficiently impaired if he is "Totally Disabled" – that he is "unable to perform [his] Own occupation for any employer in [his] Local Economy."  For the 60-month period following the elimination period, the person is sufficiently impaired if he is "unable to earn more than 80% of [his] Predisability Earnings at [his] Own Occupation for any employer in [his] Local Economy."  Thereafter, the person is sufficiently impaired if he is "unable to earn more than 60% of [his] Predisability Earnings from any employer in [his] Local Economy at any gainful occupation for which [he] is reasonabl[y] qualified, taking into account [his] training, education, experience, and Predisability Earnings."

All of the capitalized phrases quoted above are specifically-defined by the policy.  Most pertinently, the phrase "Own Occupation" means "the activity that [the person] regularly perform[s] and that serves as [his] source of income," although it is not limited to a particular job title or limited to the person's particular employer ("it may be a similar activity that could be performed with your Employer or any other employer").   The phrase "Local Economy" refers to "the geographic area surrounding your place of residence . . . within which it would not be unreasonable for you to travel to secure employment."  The phrase "Predisability Earnings" has a lengthy and convoluted definition, but it sufficient to observe that it includes annual salaries and

employee contributions to benefit plans.

    2. <u>Claim background</u>

Although the Plaintiff offers a detailed recitation of the entire history of Mr. Hammond's claim, this Court need only address the beginning and ending points of that history.  Mr. Hammond's claim arose from an injury to his right shoulder, followed by unsuccessful rotator cuff surgeries in 2006.  As a result of the injury, Mr. Hammond was left with a diminished range of motion in his right shoulder, particularly involving flexion (extending his right arm forward from the shoulder) and abduction (raising his arm outward from his side) of his right arm of more than 90 degrees, and, by extension, all overhead work involving his right arm.   The injury did not affect Mr. Hammond's use of his right hand or fingers.

Mr. Hammond contended that this limitation on his use of his right arm prevented him from performing several of the key tasks of his occupation, such as using a keyboard or computer mouse.  The record reflects that Met Life found that contention largely unavailing, believing that Mr. Hammond could support his right arm on a desk or table while typing or using a mouse.  (Mr. Hammond also claimed that his ongoing use of strong painkillers impaired his ability to think and focus, but the record does not reflect Met Life's particular evaluation, if any, of that contention.)  However, Mr. Hammond also pointed out that about 25% of his job duties involved international travel, and his injury affected his ability to perform tasks such as lifting and carrying luggage.  Based largely on his inability to fulfill those travel requirements, Met Life concluded that Mr. Hammond was "totally disabled" from his occupation and awarded benefits.

Although Mr. Hammond continued to undergo additional medical treatment in the ensuing years, and Met Life continued to regard him as eligible for benefits under the policy, the

Court need not recount the interstitial years in significant detail.  It is sufficient to fast-forward to late 2009/early 2010.  At that time, Mr. Hammond completed a periodic progress report, reporting an inability to lift his right arm independently, chronic pain in both shoulders and his back (due to "overcompensating" with his left arm), continuous use of painkillers, and frequent sleep disruptions.  He characterized his daily activities as involving "light household duties" such as doing laundry and washing dishes, going for 20 minute walks, watching movies, and driving (although his wife "provides assistance with . . . luggage, driving, etc.").

During the same time frame, Mr. Hammond's treating physician, Dr. Ogin, completed a report on Mr. Hammond's limitations.  Among other things, Dr. Ogin noted that Mr. Hammond: could sit for 8 hours per day (although he required position changes approximately every 20 minutes); could stand and walk for 2 hour periods intermittently; could operate a motor vehicle; could engage in repetitive fine finger and hand movements as well as repetitive pushing or pulling of objects; could do occasional lifting of up to 10 lbs.; could not engage in bending or stooping or reach above shoulder level; and stated that Mr. Hammond's back pain "prevents prolonged sit/stand."  Dr. Ogin opined that Mr. Hammond could work a total of 8 hours per day, but also stated that he had not advised Mr. Hammond to return to work due to his ongoing disability.   Met Life sought clarification of this apparent disparity, and a week later, Dr. Ogin submitted a new report that stated "patient cannot work, this [indication of ability to work 8 hours per day] was an error."

In the meantime, Met Life retained a private investigator to conduct video surveillance of Mr. Hammond.  On one occasion, the investigator observed Mr. Hammond shoveling snow and talking to a neighbor for a period of approximately two hours.  On another occasion, the

7

investigator observed Mr. Hammond get into his truck and drive to another house, open the

tailgate of the truck, and then close the tailgate again after another individual had loaded a box

into the truck bed.  Mr. Hammond and other individuals then drove to Home Depot and, at the

conclusion of shopping, "helped load" three bags of cement into the truck while his companions

loaded pieces of sheetrock.  The men then returned to the house, at which time Mr. Hammond

"helped with a home remodeling project" there.  The investigator's report states that Mr.

Hammond "bent over several times as he picked up several bags of cement and mixed it with an

auger.  He also used a power saw to cut some sheetrock, carried several tools and buckets of

cement up a flight of stairs and into the residence."[2]

Met Life referred the file to an independent physician, Dr. Del Valle, for evaluation.[3]  Dr.

Del Valle ultimately concluded that Mr. Hammond did not suffer from functional limitations,

that he was unable to abduct or flex his right arm above 45 degrees, but that he was able to use

other muscles to obtain limited abduction of that arm.  Dr. Del Valle noted that Mr. Hammond

---

[2]     If anything, the investigator's description of the surveillance video somewhat understates its contents.  For example, the video of Mr. Hammond's contributions to the home improvement project includes more than an hour of essentially uninterrupted work by Mr. Hammond in a standing or stooping position, during which he lifts (often using his right arm) what appear to be 20-30 lb. bags of thin-set mortar and pours them into a 5-gallon work bucket, lifts a nearby bucket of water and pours it into his work bucket, lifts and operates an electric drill with an extended auger attachment for a period of several minutes (frequently raising and lowering the auger into the substance in the work bucket), uses both his right and left hands to scrape down the sides of the work bucket, bends over and lifts the bucket with his right arm, and caries it up several patio stairs and into the home.  He then repeats essentially the same process a second time, and is in the midst of a third repetition (in addition to having carried a hand-held circular saw from the garage to the porch area and cutting some drywall) when the video ends.

[3]     The Plaintiff contends that Dr. Del Valle, an internal medicine specialist, lacks appropriate qualifications to assess the record here, and that a specialist in pain management or rehabilitation should have been consulted.  The Plaintiff also points out several factual discrepancies between statements in Dr. Del Valle's report and the record, such as instances in which Dr. Del Valle relies upon untimely records or states facts for which no source is identified.

retained the ability to flex fully at his elbow, was able to push and pull with his right arm kept to

his side, and that he retained full use of his right hand and fingers.  She concluded that Mr.

Hammond could perform typical desk functions (typing, keyboarding, and use of a computer

mouse), as such tasks are normally done with the arm in a minimally abducted position.  She

further concluded that he could do some limited lifting (at low weights and with no abduction

greater than 30 degrees) and perform tasks such as pushing or pulling wheeled luggage with his

arm at his side.

Met Life submitted the video surveillance records to Dr. Ogin for his comments.  Dr.

Ogin observed that:

> [the videos] revealed that he was able to shovel some snow,
> generally just pushing the shovel along the ground rather than
> lifting it.  He was also seen lifting some bags of mulch and then
> doing some work in front of a house.  He did not demonstrate any
> overhead activity but was using his right arm pretty easily, at the
> waist level or so, and was also bending and walking pretty easily.
>
> In our office today, I reviewed some of the DVD surveillance
> video with Mr. Hammond.  He admits it was him and that he was
> doing those activities, but states that is not unusual for him.  He is
> generally able to do activities but will be sore afterwards.  It is the
> prolonged activities such as prolonged standing or walking that
> aggravate him.  Furthermore, he relates difficulties being able to
> work, even in a sedentary job, because of problems with
> concentration due to medication and side effects.  Furthermore, he
> has to do a lot of walking and traveling at work, which involves
> carrying a laptop and luggage.  It was opined by a reviewing
> physician that Mr. Hammond would be able to do sedentary
> activities.

Dr. Ogin did not express any opinion of his own as to whether he agreed that Mr. Hammond

could perform sedentary work, or otherwise comment on Mr. Hammond's statements; he merely

noted that he intended to continue treatment of Mr. Hammond at current levels.  Met Life

submitted Dr. Ogin's statement to Dr. Del Valle for further comment.  She noted that Dr. Ogin did not disagree with her conclusions and that she continued to hold the opinion she had expressed earlier – that Mr. Hammond could perform the duties of his position.  As to Mr. Hammond's contention that his medication regimen impaired his ability to work, Dr. Del Valle stated that "he should avoid any medications that have any untoward effects," or that he should be restricted from driving.

Met Life contacted Mr. Hammond in order to obtain a complete job description for his position.  Among other things, Mr. Hammond reported:  regular 8-hour work days, with extra hours on occasion; 30-35% of job time spent traveling to other locations, which required meeting with people, walking around sites, and carrying a laptop; and frequent use of a computer and phone and review of physical documents.  Met Life then consulted with a Vocational Rehabilitation Consultant.  The Consultant opined that Mr. Hammond's job "is best represented by the combination of" the jobs of "Vice President" and "Computer Security Specialist," and determined that both positions required sedentary work, tasks of reaching and handling, and use of the fingers, all of which Mr. Hammond was able to do.  The Consultant agreed with Dr. Del Valle that Mr. Hammond could perform the additional job duty of traveling by using wheeled luggage, airport carts, and airline personnel assistance.  The Consultant reviewed reports that confirmed that jobs of Computer Security Specialist and Vice President were available in the local labor market, and that based on Mr. Hammond's years of experience, he could expect to earn the median wage of a Vice President and at the 75th percentile of compensation for a Computer Security Specialist.

Based on these conclusions, Met Life terminated Mr. Hammond's eligibility for benefits

10

on July 7, 2010.  Mr. Hammond timely filed an appeal of that claim, raising numerous objections (both general and specific[4]) to Met Life's findings and conclusions.  Met Life retained Dr. Marion, a specialist in pain medicine and rehabilitation, to review Mr. Hammond's appeal and the entire file.  Dr. Marion's recites most of the foregoing facts (among others), and adds certain additional information that Dr. Marion obtained.  Most notably, Dr. Marion apparently spoke to Mr. Hammond's primary care physician, Dr. Mignoli, who stated that although he did not treat Mr. Hammond for any specific occupational issues, he "indicated there are no specific medical issues  that would preclude [Mr. Hammond] from working."  Dr. Marion also apparently spoke to Dr. Ogin, who (according to Dr. Marion) "agreed [Mr. Hammond] was functionally capable of working at the sedentary to light occupational level with a restriction of no overhead lifting utilizing the right arm."  Dr. Marion also recorded that Dr. Ogin "specifically indicated that [Mr. Hammond] did not have cognitive deficits" from his medication regimen and that he was not restricted in his ability to drive.  Dr. Marion thus concluded that although Mr. Hammond "has well-documented right shoulder impairment," he "is otherwise clinically independent with activities of daily living" and "capable of 8 hours of work duties [in] a modified light capacity [job] as it relates to his right arm."  Accordingly, Met Life denied Mr. Hammond's appeal.

 C.  Merits

 The parties agree that the policy language pertinent to Mr. Hammond's claim here provides that he is "disabled" – and thus eligible for the benefits sought by the Plaintiff – if he

---

[4]     Among other things, Mr. Hammond contended generally that his work days often exceed 8 hours, and that his chronic pain and loss of sleep required him to take frequent breaks during the day.  Mr. Hammond's specific contentions included, among many others, assertions that the snow he was seen shoveling was light, that his shoveling of it was unfocused and ineffective, and that a healthier person could have completed the task in a fraction of the time that Mr. Hammond spent on it.

was "unable to earn more than 80% of his Predisability Earnings at his Own Occupation . . . ." as of 2010. The Court need not parse all of the particular components and defined phrases embedded within this term of the policy, as it appears that the parties do not dispute matters such as the existence of jobs similar to Mr. Hammond's in the local economy, or the degree to which Mr. Hammond could secure compensation sufficiently similar to that of his position with Citigroup.[5]   Rather, the parties' dispute is simpler: whether Met Life properly concluded that Mr. Hammond could perform all of the essential duties of his former position (or any similar position), given his medical limitations as of 2010.

### 1. Substantial evidence

The Court first turns to the question of whether the evidence in the administrative record is sufficient, as a factual matter, to support Met Life's conclusion. The best place to begin that inquiry is with Dr. Ogin's January 2010 report. Dr. Ogin is a specialist in pain management and rehabilitation, and had been treating Mr. Hammond regularly since 2008. Dr. Ogin's 2010 report indicated that, despite Mr. Hammond's medical ailments, Mr. Hammond could sit for a continuous 8-hour period (albeit with frequent changes of position), stand and walk for periods of two hours at a time, could do occasional lifting of small amounts of weight (albeit not over his head), could push and pull items, and could repetitively perform fine motor skills with his fingers. This collection of skills encompasses nearly every required aspect of Mr. Hammond's job, covering the essential aspects of the desk work (involving prolonged sitting and fine finger

---

[5]     The Court finds that Met Life concluded that jobs such as Computer Security Specialist and Vice President were sufficiently similar to Mr. Hammond's job with Citigroup as to meet the policy's definition of "Own Occupation," that such jobs existed in Mr. Hammond's "Local Economy," and that such jobs offered compensation sufficiently equivalent to Mr. Hammond's "Predisability Earnings." These conclusions are adequately supported by the record.

movement for tasks such as typing), travel (prolonged sitting, pulling wheeled luggage), and visiting remote sites (sitting in meetings, walking around facilities).  It is undisputed in the record that Mr. Hammond remained impaired in his ability to lift his right arm to shoulder level or above his head, but nothing in either Mr. Hammond's own recitation of his job duties or elsewhere in the record indicates that such lifting or reaching was a significant aspect of his job duties.  Thus, a fair reading of the record indicates that by 2010, even Dr. Ogin, Mr. Hammond's own physician, believed that Mr. Hammond could perform the tasks that comprised the essential components of his job.[6]

Indeed, there is precious little in Dr. Ogin's January 2010 report that supports the Plaintiff's position that Mr. Hammond remained unable to resume his job duties as of that time. The only evidence from Dr. Ogin's report (as subsequently corrected) that is favorable to the Plaintiff's position here is Dr. Ogin's withdrawal of his statement that Mr. Hammond could work 8 hours per day and his statement that he had not recommended that Mr. Hammond return to work.  But notably, the explanation that Dr. Ogin gave for not recommending that Mr. Hammond return to work was the observation that he "has been on disability since I've been treating him." Far from an assertion that Dr. Ogin believed that Mr. Hammond could not resume performance of his job, this statement is most reasonably interpreted to reflect that Dr. Ogin recognized that someone else had adjudicated Mr. Hammond to be disabled, and thus, Dr. Ogin did not intend to overrule that determination by recommending that Mr. Hammond resume work.

The remaining record from Dr. Ogin himself is ambiguous.  His report to Met Life after reviewing the surveillance video with Mr. Hammond presents Mr. Hammond's statements

---

[6]      As noted above, Dr. Marion's report indicates that Dr. Ogin allegedly represented as much to him.

disputing the extent of his ability to work (*e.g.* that he can do physical tasks for short periods, but will then require extended rest).  But it is not clear whether in reciting Mr. Hammond's explanations for the events shown on the video, Dr. Ogin was intending to adopt Mr. Hammond's statements as his own medical findings or whether Dr. Ogin was merely acting as a reporter, conveying Mr. Hammond's explanations without necessarily endorsing them.  Dr. Ogin's report acknowledged Dr. Del Valle's conclusion that Mr. Hammond could perform the duties of a mostly sedentary job, but did not indicate that Dr. Ogin disagreed with that conclusion.  In such circumstances, it would be reasonable for Met Life to construe Dr. Ogin's silence on that point as reflecting his agreement with Dr. Del Valle.  Moreover, that ambiguity is largely resolved by the statement allegedly made by Dr. Ogin to Dr. Marion, in which Dr. Ogin "agreed [Mr. Hammond] was functionally capable of working at the sedentary to light occupational level" so long as he did not have to do overhead lifting with his right arm.  Although the Plaintiff seems to imply that Dr. Marion's recitation of this hearsay statement by Dr. Ogin should not have been credited by Met Life, the Plaintiff has not provided an affidavit from Dr. Ogin denying making any such statement, or otherwise offered any concrete evidence to rebut Dr. Marion's statement.

That leaves Mr. Hammond's statements as to limitations.  Even these are not inconsistent with a finding that Mr. Hammond could have resumed his job duties as of 2010.  Mr. Hammond acknowledged to Dr. Ogin that tasks such as shoveling snow for two hours or assisting in a home improvement project were "not unusual" for him and tasks that he was "generally able" to do, albeit with some residual soreness thereafter.  Nothing in the record elaborates on the nature of this residual soreness, much less indicates that the soreness itself had a subsequent disabling

effect.  Nor does Mr. Hammond dispute that, as shown in the video, he is capable of standing and walking for two-hour periods (as he did while shoveling show) or lifting and carrying objects weighing 10-15 lbs. (as he did during the home improvement project), tasks that are entirely consonant with the typical duties of his job.

Mr. Hammond's comments to Dr. Ogin regarding the surveillance video and his assertions in his appeal letter suggest that his continued disability is due to other impairments – a lack of mental focus resulting from the side effects of pain medication and back and leg pain resulting from arthritis and spinal degradation.  Both contentions find little support in the record. Dr. Ogin treated Mr. Hammond for his back and leg pain. Thus, Dr. Ogin's January 2010 evaluation of Mr. Hammond's abilities necessarily reflected his opinion that, notwithstanding those injuries (as well as Mr. Hammond's shoulder injury), Mr. Hammond could still sit for 8 hours, stand for 2 hours, push and pull, etc.

Similarly, although Mr. Hammond claimed that the cumulative effects of his pain medication caused him to suffer diminished cognition or an inability to "focus," that contention is not supported by any medical evidence in the record.  Notably, the Plaintiff does not point to treatment notes from Dr. Ogin (or any of Mr. Hammond's other medical providers) that recite and evaluate Mr. Hammond's reports of cognitive impairments from his pain medication.[7]  To

---

[7]     The Court's own review of the record reveals only a single reference in Dr. Ogin's treatment notes to any medication-induced cognitive deficits.  In a note regarding a May 11, 2010 treatment session, Dr. Ogin recorded Mr. Hammond's report that a new medication he was taking, Cymbalta, was "is helpful, particularly in regards to some of the leg numbness."  Dr. Ogin's notes relate that Mr. Hammond reported that "he is mildly sedated on this," but also mention that Mr. Hammond had just recently begun taking a new, higher dosage of the drug. Interestingly, this was the same visit in which Dr. Ogin and Mr. Hammond reviewed the surveillance videos and Mr. Hammond commented on his cognitive impairments as discussed above.  Dr. Ogin's report regarding this session does not indicate that Dr. Ogin sought to modify

the contrary, the record reflects that, "When asked directly about cognitive issues" by Dr. Marion, Dr. Ogin allegedly opined that Mr. Hammond "did not have cognitive defects."  This sentiment was echoed, in more general terms, by Mr. Hammond's primary care physician, Dr. Mignoli, who agreed that "there are no specific medical issues that would prevent [Mr. Hammond] from working.  And the record reflects not only that Dr. Ogin did not see fit to restrict Mr. Hammond's ability to drive, but also that Mr. Hammond drove himself and others to Home Depot and back.  Although the Court agrees in the abstract that Dr. Del Valle's offhand suggestion that Mr. Hammond discontinue taking pain medications that caused his claimed cognitive deficits was flippant and insensitive, the actual medical record fails to provide any support for the contention that Mr. Hammond was suffering from medication-induced cognitive deficits so severe as to prevent him from performing the intellectual duties of his job.

Accordingly, the Court finds that there is substantial evidence in the record to support Met Life's conclusion that Mr. Hammond was capable of performing the duties of his job as of 2010, and thus, was no longer "disabled" under the terms of the policy.

---

Mr. Hammond's drug regimen to deal with the sedative issues of the drug, or otherwise address Mr. Hammond's claim of cognitive defects in response to viewing the surveillance videos. Moreover, none of Dr. Ogin's subsequent treatment notes for Mr. Hammond comment in any way about continuing cognitive impairments, whether self-reported by Mr. Hammond or observed by Dr. Ogin.

In August 2010, Mr. Hammond began seeing a psychologist, Ms. Price.  Her reports from two treatment sessions indicate that Mr. Hammond reported "affective distress," such as "increasing sensitivity and sadness," difficulty sleeping, loss of interest in formerly enjoyable activities, "lower energy in the mornings, decreased concentration, and decreased libido."  Ms. Price opined that Mr. Hammond should receive treatment for "moderate depression," but at no time opined that Mr. Hammond's "decreased concentration" was the result of medication side effects or that it impaired his ability to work.  Indeed, in her next session with Mr. Hammond, Ms. Price found him to be "insightful."

2. <u>Arbitrary and capricious</u>

Having concluded that the administrative record provides substantial evidence to support Met Life's conclusion that Mr. Hammond was able to resume the duties of his job by 2010, the Court turns to the Plaintiff's remaining arguments, all of which suggest that Met Life acted arbitrarily and capriciously in deciding to deny benefits.

The Plaintiff's first argument is: Met Life had found Mr. Hammond to be "disabled" under the terms of the policy since at least 2006, and the medical record provides no evidence of any material improvement in his condition during that time period.  Thus, Met Life arbitrarily decided in 2010 that the very same conditions and medical restrictions on Mr. Hammond that had persisted since 2006 no longer constituted a "disability."

This argument is not supported by the evidence.  The record reflects that the decisions between 2006 and 2010 to grant Mr. Hammond benefits and, thereafter to continue those benefits, were predicated largely on conversations with Mr. Hammond and Dr. Ogin, both of whom agreed that Mr. Hammond was disabled.  For example, Met Life's November 2008 decision to continue paying benefits to Mr. Hammond was predicated on a "personal questionnaire" ("PQ") completed by Dr. Ogin on October 23, 2008, and on conversations between Met Life and Mr. Hammond.  In that PQ, Dr. Ogin reported that Mr. Hammond could sit for 4 hours at a time, stand and walk for 2 hours at a time, could "seldom" perform tasks such as grasping, pushing/pulling, or handling/fingering with his right arm/hand.  Although Met Life recognized that it had some records from another doctor that supported "work capacity," it deferred to contrary conclusions expressed in Dr. Ogin's PQ, and in Met Life's interview with Mr. Hammond.

Indeed, Dr. Ogin's 2008 PQ stands in sharp contrast to his January 2010 report. Instead of being limited to 4 hours per day of sitting, Dr. Ogin concluded in 2010 that Mr. Hammond could sit for a full 8 hours per day. Instead of finding that Mr. Hammond was essentially unable to do any sort of grasping, pushing or pulling, or manipulation objects with his right hand or fingers, Dr. Ogin's 2010 report concluded that Mr. Hammond could perform all of these tasks repetitively. Whereas the 2009 PQ prevented Mr. Hammond from performing key duties of his position, such as using a computer and typing, Dr. Ogin's January 2010 report paints a picture of Mr. Hammond being able to perform nearly all of his job's duties without only minimal needs for accommodations. Moreover, for the first time, Dr. Ogin had opined that Mr. Hammond could indeed work for a period of 8 hours per day (although Dr. Ogin subsequently withdrew that portion of his opinion). This expansion of Mr. Hammond's apparent working capacity, coupled with Met Life's subsequent acquisition of surveillance evidence that further illustrated Mr. Hammond's considerable physical abilities, constitutes precisely the type of new evidence that would reasonably lead an insurer like Met Life to revisit, and very likely reverse, prior findings of disability that had been made on more limited evidence.

The Plaintiff's second argument is that Met Life should not have given deference to the opinions of retained consultants such as Dr. Del Valle and Dr. Marion. The Plaintiff points out reported decisions in which other courts have "severely criticized" their work, cites to sums paid by Met Life to these doctors in various years, and points out mostly minor inconsistencies or points of disagreement over various assertions by these doctors in their reports. The Court does not find this argument or its rationale compelling, largely because the opinions of Dr. Del Valle and Dr. Marion are largely peripheral to the basis for Met Life's decision in this case. Dr. Ogin's

opinions were the primary medical basis for Met Life's decision.  As described by Mr.

Hammond himself, his major job duties involved lengthy periods of sitting and typing,

international travel on airplanes (including management of luggage and a computer), and visits to

other facilities that required walking.  Dr. Ogin's January 2010 report (as supplemented by Dr.

Ogin's statements to Dr. Marion and other evidence in the record, such as the surveillance

videos) makes clear that Mr. Hammond could perform all of these tasks with only a modicum of

accommodations (frequent changes of position while sitting, support for his right arm while

typing, use of wheeled luggage, etc.).  In this sense, Dr. Del Valle and Dr. Marion's opinions did

little more than confirm what Dr. Ogin had already concluded – that Mr. Hammond was capable

of performing his job duties.  Thus, even assuming that Dr. Del Valle and Dr. Marion's opinions

should have been discredited by Met Life to some extent – and the Court certainly makes no

such finding – Met Life relied primarily on Dr. Ogin himself, not Dr. Del Valle or Dr. Marion, to

support its decision.

That leaves the question of Met Life's conflict of interest.  As discussed above, *Glenn*

requires the Court to give appropriate weight to any conflict of interest that might affect the

reasonableness of the discretion exercised by the insurer when considering a claim.  Here, the

Plaintiff points out two conflicts of interest that she contends should result in the Court giving

only minimal deference to Met Life's discretion.  The Plaintiff directs the Court's attention to

Met Life's financial interest in the outcome of the decision and its failure to adequately address

Mr. Hammond's receipt of Social Security Disability Insurance ("SSDI").

As to Met Life's financial incentive to deny Mr. Hammond's claim, it is well-settled that

an insurer who both funds the payment of benefits and evaluates the claims has a financial

incentive to deny claims in order to avoid incurring payment obligations, leading to a conflict of interest. *See Glenn*, 554 U.S. at 114-15. The extent of that conflict of interest is informed by several factors, such as the degree to which the Plan Administrator's compensation is linked to the denial of benefits and the extent to which the provision of benefits has a significant economic impact on Met Life. *See Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d at 1291, 1296 (10th Cir. 2000). Met Life has come forward, without objection or contradiction, with an affidavit that attests to the fact that Met Life claim decision makers have no communications with its finance department, and that claims-handling personnel do not receive any compensation or bonuses based on their approval or rejection of claims. Courts have often concluded that such separation between claim decisions and finance concerns  mitigate the effect of a potential financial conflict of interest. *See e.g. McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); *Bolt v. Honeywell Intl., Inc.*, 814 F.Supp.2d 913, 923 (D.Ariz. 2011); *Brown v. Hartford Life Ins. Co.*, 428 Fed.Appx. 817, 821 (10th Cir. 2011) (unpublished).

The Plaintiff also points out that Met Life encouraged Mr. Hammond to apply for SSDI benefits in 2007 and that the Social Security Administration awarded such benefits to Mr. Hammond in February 2009, finding him to be unable to engage in gainful employment. The Plaintiff cites cases such as *Brown v. Hartford Life Ins. Co.*, 301 Fed.Appx. 772, 776 (10th Cir. 2008), for the proposition that a court may find an insurer's denial of a disability claim to be arbitrary and capricious where the insurer initially encouraged the employee to claim SSDI (and the insurer benefitted financially from the employee being awarded such benefits), but thereafter gave no consideration to the award of SSDI benefits when deciding that the employee was not disabled under the terms of the policy. The cited *Brown* decision reversed a district court's

20

affirmance of an insurer's denial of long-term disability benefits, remarking on the insurer's "conclusory" discussion of the apparent incongruity between an award of SSDI to the claimant and the insurer's own determination that the claimant was not disabled.  *Id.*   It stated that "a reviewing court should have factored the inconsistency created by [the insurer] instructing [the insured] to apply for SSD[I] and reaping the benefits of a successful determination, then summarily rejecting the evidentiary value of that determination almost without comment, into its determination" of whether and to what extent a conflict of interest existed.  *Id.*

It is important to read *Brown* carefully.  It does not stand for the proposition that a disability insurer who encourages an insured to apply for SSDI is <u>bound</u> by the SSDI determination in assessing an insured's eligibility for benefits under the policy language; rather, *Brown* requires the insurer to give more than a conclusory explanation as to why it chose to reach a different determination on the question of disability.  *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011).  Ultimately, whether an insurer fails to adequately consider an SSDI award is part of the larger question of how much deference should be given to the determinations of a conflicted insurer.[8]  *See e.g. Brown*, 428 Fed.Appx. at 820-21

---

[8]      An argument could be made that the failure of an insurer to adequately consider an SSDI award is standalone evidence of arbitrary and capricious decision-making, not merely one component of the multi-faceted conflict of interest factor.  *See e.g. Salomaa*, 642 F.3d at 679 ("Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion").  The Supreme Court's decision in *Glenn* seems to equivocate on the question, observing that the failure of the insurer to adequately address the SSDI award "was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous)."  554 U.S. at 118.  Because this Court finds that Met Life's consideration of Mr. Hammond's SSDI award, even if inadequate, fails to overcome the clear evidence in the record that Mr. Hammond could perform

(appeal following remand) (finding that failure of District Court to adequately address insurer's

consideration of SSDI award did not outweigh insurer's efforts to prevent financial conflict of

interest).

Here, Met Life specifically acknowledged Mr. Hammond's SSDI award in its letter

denying Mr. Hammond's appeal of the benefit denial.

> . . . although we acknowledge that you have been awarded SSDI
> benefits effective October 16, 2006 based on the SSDI conclusion
> of restrictions and limitations of no climbing, and no reaching with
> the right upper extremity and handling and fingering up to 45
> degrees related to your musculoskeletal conditions, the medical
> information supports the restrictions and limitations of no overhead
> reaching with your right upper extremity, lifting up to 20 pounds,
> and occasionally more than 20 pounds as long as the lifting does
> not require a concurrent abduction greater than 30 degrees in your
> right arm and that the requirements of your occupation fall within
> the restrictions and limitations assessed by the [vocational
> rehabilitation] consultant beyond July 9, 2010.

The Court confesses some difficulty in understanding the meaning of this sentence.  Its best

efforts yield a conclusion that Met Life recognized that SSDI benefits were granted to Mr.

Hammond based on a finding that he could perform no climbing of any kind, could not reach

with his right arm, and could not perform any manipulation of his hands or fingers on his right

hand at a range exceeding 45 degrees from some unspecified bodily plane.[9]  By contrast, Met

Life concluded that the record supporting a finding that Mr. Hammond was limited only in

performing overhead reaching and that he could lift 20 pounds (or more, if the lifting did not

---

the duties of his job, the Court need not conclusively determine where this question should be
slotted in the analysis.

[9]     This is a reasonable interpretation of the Social Security ALJ's findings, although after
reciting these restrictions (that were certified by a medical consultant); the ALJ opined that
additional medical evidence submitted by Mr. Hammond after the hearing "would warrant a
more significant limitation of the upper right extremity."

require him to extend his right arm beyond 30 degrees to his side).  Met Life believed that these restrictions did not exceed the demands of the job of either a Vice President or Computer Security Specialist.  In short, Met Life's explanation for diverging from the SSDI finding is that it believed the medical record before it justified fewer restrictions on Mr. Hammond's activities than did the record before the Social Security ALJ.

As discussed above, there can be little question that this was the case.  Given the focus of each determination, differing outcomes are not surprising.  Mr. Hammond's SSDI application, made in 2007 was adjudicated by 2009 with a retrospective focus.  It did not and could not have included Dr. Ogin's January 2010 evaluation or the surveillance video.

In contrast, the determination made by MetLife was effective in 2010 with a prospective focus.  Put another way, although Mr. Hammond had been disabled in 2009 and before, his condition in 2010 was not disabling.  Dr. Ogin's January 2010 report stated that Mr. Hammond could perform tasks such as pushing and pulling with his right arm and was unrestricted in his ability to use his hands and fingers on his right hand (subject, perhaps, to the global restriction on Mr. Hammond using his right arm to reach overhead), and the surveillance video demonstrating various movements that Mr. Hammond was able to make without difficulty.  Thus, although inartfully phrased, the Court understands Met Life to state that it recognized the SSDI award, but did not find it binding in light of more contemporaneous evidence of Mr. Hammond's condition. This conclusion is consistent with the record and an entirely reasonable basis for Met Life to decline to give persuasive effect to the SSDI award.

Ultimately, the conflict of interest factor, even if granted some weight, does little to undercut the reasonableness of Met Life's conclusions.  Notwithstanding the past record of Mr.

Hammond being deemed "disabled," the record reflects that as of 2010, Mr. Hammond's own doctor believed that Mr. Hammond could sit for an entire work day (with frequent position changes), could walk and stand for lengthy periods of time, could type on a computer and lift objects, could push and pull items, and had no discernable cognitive impairments – tasks which, cumulatively, accounted for essentially the entirety of his job functions.  Some of these observations were corroborated by surveillance video demonstrating Mr. Hammond's abilities.  No contemporaneous evidence from any medical provider affirmatively refuted any of these findings; Mr. Hammond's own statement of his self-perceived limitations is the only contrary evidence in the record.   Under these circumstances, even assuming that the Court should withhold some deference from Met Life's exercise of its discretion, the Court cannot say that Met Life's determination that Mr. Hammond was no longer "disabled" under the terms of the policy was arbitrary and capricious or contrary to law.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff has failed to demonstrate that Met Life's decision to deny benefits to Mr. Hammond after 2010 was arbitrary and capricious or otherwise in violation of 29 U.S.C. § 1132.  The Clerk of the Court shall enter judgment in favor of Met Life on the claims in this action and thereafter close this case.

Dated this 17th day of December, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

24